Good morning, ladies and gentlemen. We are delighted this morning to have Judge Phil Gilbert of the Southern District of Illinois sitting with us to pursue our common calling. Welcome. Our first case for argument this morning is ProLite Building Supply v. Ply Gem. Mr. Stevens. Good morning. My name is Dan Stevens and I represent ProLite. And this case, as you know, is about windows. When I was 14, I took a woodshop class, which I got a D in. But recently, I took on a project of making window frames for a friend of mine's artwork. And I went on YouTube to learn how to make window frames. And I learned that the most important thing in making a window frame is making sure that the parallel parts of a window are the same length. In other words, the two sides are the same length and the top and the bottom is the same length. Because if you make the parallel parts of a window the same length, then the mitered corners do not have gaps. And all a vinyl window is is basically a window frame made out of plastic, PVC vinyl, that is cut in a factory. And whereas these corners were glued and nailed by me in a vinyl window, they're sealed together with a process that melts the plastic and seals the joints. But a window frame is a big frame and then it's got parts. Counsel, our time is short. We're going to need to focus on the legal issues. The first legal issue is whether we have subject matter jurisdiction in this case. The district court explained, and after some efforts, the parties have explained why there is subject matter jurisdiction with respect to Prolite's claim. I'm worried now about subject matter jurisdiction with respect to the customer claims. They are properly before the court, if at all, under the supplemental jurisdiction statute. And that statute says that there is jurisdiction over supplemental claims only if they are part of the same case or controversy. Could you explain why you think they are part of the same case or controversy? The connection between those claims and the main claims is they essentially involve the same windows. That's not what I was asking. I'm well aware of that. I'm asking why they are part of the same constitutional case or controversy. That is the statutory question. There could be zillions of claims involving vinyl windows that are not part of the same case or controversy. I filed this in state court. I objected to removal. So I have no idea, as I'm standing here before you, why they should be part of this case. Your no idea is not a satisfactory answer. Jurisdiction is something that is essential at every stage of the case, and it is the responsibility of every lawyer at every stage of the case to address jurisdiction. We had a great deal of difficulty getting you to address jurisdiction, and this issue seems to have completely missed everybody. It certainly missed me. The language of the statute poses a concrete question that needs to be answered. All right, please proceed. The problem with these windows is that they were made with parts. I think, counsel, you need to address the legal issues. Pro-Lite's claim depends on a contract. We need to think about the contract. I'm sorry for interrupting my colleague. No, that's fine. I'm going to ask you a question, and we can start off. What defense does Pro-Lite have against the claims for payment by Great Lakes? Are Great Lakes windows at all involved in any of the warranty claims or in Pro-Lite's contract claim? Well, the only connection there is if there is an overriding contract between Pro-Lite and Plygym that has various components, including the service component and the purchase of the windows, that if there is a breach in the part of the contract that relates to the production of reasonable windows, it discharges, and that part is breached. I believe it discharges Pro-Lite from paying for those windows. Now, the expert characterized the air infiltration as excessive. Now, excessive compared to what? Are the defendants correct that the expert did not examine the window manufacturing specifications? That's correct. Yeah. In other words, by looking at the window, you can see major gaps in the window that allow bugs and air and moisture in that blows through, that can blow out a lighter and move the curtains and windows. He believes that he doesn't have to look at the specifications to determine that that is a defective window. Plygym's response by spending hundreds of hours and thousands of dollars correcting this problem indicates that they acknowledge that this was a problem. Otherwise, they wouldn't have done this. You know, I saw that the expert made an effort to exclude installation as a cause of the excessive air infiltration. Did the report also address materials, design, any other possible causes? Well, what I was trying to explain in the beginning is that if this is basically a window and you've got a part like this in the middle, and you can see by looking at it, the part is too long and the top is bowed and the bottom is bowed because the strut in the middle is too long, and then you see the gaps around it where it's too long. You don't need to look at the specifications to understand that this part should have been made shorter so that it wasn't bowing the top and bowing the bottom. This isn't a technical deal. So is there a specific conclusion in the report that the air infiltration is due to a manufacturing defect? Absolutely. That's his conclusion. Because if the parts, and this is why I went into this thing in the beginning, if the parts are cut correctly, then there aren't gaps. But if you cut any of the parts too long or too short and you put them together, there are gaps. And, you know, the question is, are these gaps excessive? I mean, they're clearly a manufacturing issue, and if the gaps are excessive and there's air infiltration, they weren't made right. Did the expert compare it with a properly manufactured window in his report, one of the problems that the district judge had with the expert report? He just went out there and said, yeah, there's air infiltration, but when he did his report, did he compare it with a properly manufactured and how do we know whether it's manufactured or designed? The district judge was a little concerned about that. Well, if you bought a car and there's a big hole in the door and it was that way from manufacturer, would you have to look at all the other cars to say, geez, maybe this car shouldn't have a big hole in the door? We're not talking about cars. Well, if a window has big gaps and you can see certain parts are too long and the air comes through there, whether it was designed that way or manufactured that way, you don't need to look at anything else to say, this isn't how windows should be made. Council, I must say, like the district judge, I just don't understand that. Maybe all that's happening is that Plygem makes shoddy goods, and these were manufactured exactly as Plygem intended, but, of course, in this world you get what you pay for. To show that there's a manufacturing defect, it seems to me, you have to show what they are trying to do to see whether there's comportment with that. My client had been dealing with Plygem for a number of years, and the previous window, the classic, he'd sold for like seven years without problems. This 1500 series comes out, and like all new products, it comes out with glitches. And the question here is, you know, it's not that difficult to cut parts of windows to proper lengths. I mean, that's not rocket science. And had these parts of these windows simply been cut to the proper lengths, you're not supposed to have all of this air coming through windows, even cheap windows. I mean, the basic window that's out there. Well, you say that, but that may be your belief, but it's not clear that that has anything to do with a manufacturing defect. Let me put this a different way. Have either Prolite or the consumer plaintiffs made a claim under the UCC's implied warranty of merchantability? No. I take it that was a deliberate choice. Yes. Because that's where this is just shoddy would go. That's the logical place for it. Okay. Our claim is that we believe the interpretation from the consumer standpoint of the warranty, and because of the language that Plygem has in their service rebate obligation with Prolite saying that Plygem will respond to excessive reoccurring manufacturing product issues, that this, and considering the fact that they corrected it within a couple of years, by making the parts the right length, and then after that the windows didn't leak, that this was just simply a manufacturing error that should have come under the warranty. Well, you argued in your reply brief that for the purposes of notice, that Prolite was an agent of Plygem for purposes of notice. Is that what you're arguing? Yes. Then is Prolite being an agent of Plygem? Are they responsible for breaching the warranty too? No. They don't give the warranty. The warranty goes directly from Plygem to the consumer. Prolite is merely no more in that respect than a service technician for Plygem. They don't issue the warranty. They service the warranty. So were they an agent for Plygem or not an agent for Plygem? They were. They were. They were Plygem's contact with the consumer. They did what Plygem told them. They operated under Plygem. Did Prolite ever ask Plygem for a complete reinstallation? They had numerous discussions about the problem, but no. No? Okay. The answer is no, they didn't. That's the answer. So they never requested replacement windows. Is that what you're saying? Well, they simply operated at the direction of Plygem, and no, they never said, look at Plygem, you need to go out and replace all these windows, because they believed that Plygem had the expertise, the engineers, the technicians. They sent numerous people out here. They gave them the materials to use. They instructed them how to use them. And because Plygem is the one that controlled all of the repair process, they just followed Plygem's directions. So you're saying that Plygem had notice and an opportunity to fix the issues? Plygem came out to every single one of these homeowners that we talked about and dozens of other ones, provided the materials, gave the direction, worked side by side with Prolite in attempting to deal with the service issues from the very beginning. There was constant contact between Prolite and Plygem regarding the defects in these windows. Did Plygem abide by the written terms of the contract? Are you talking about the contract with Prolite? Correct. Not based upon the good faith interpretation of that. Okay. Do you have any cases similar to the facts of this one holding that Plygem violated covenants of good faith and fair dealing? No, not specifically with regard to these facts. I have about five minutes left. Is it okay if I reserve that? Certainly, counsel. Thank you. Thank you, Mr. Stevens. Mr. Furholt. May it please the Court, counsel, on behalf of M.W. Manufacturers, Inc., in this matter, first of all, Your Honor, in response to your initial question about subject matter jurisdiction, it's our position that the homeowner claims indeed arise out of the same case or controversy, and here's the reason why. Prolite has made a claim, generally speaking, that the 1500 series windows it bought and sold in Wisconsin from M.W. Manufacturers were defective in their manufacture. The homeowner's claims, in particular the ones that arise out of the 1500 series windows, are windows that were sold by Prolite to these homeowners, and the homeowners are indeed claiming that. Yes, they have the windows in common, but is it the same claim? Yes, Your Honor. As I understand this, Prolite's claim depends on the terms of its contract with Plygem, whereas the homeowner's claims depend on the terms of their warranty, particular facts about their windows, whether they properly notified Plygem of defects, and so on. Those don't sound like the same case or controversy. They sound like different controversies that have something in common. Mr. Stevens, would you sit at the counsel table, please? Your Honor, I think that they do arise out of the same set of facts which involve the same particular issues, in particular, this whole issue of whether or not there is a manufacturing defect in these windows. Yes, they have an issue in common. Correct. But what makes you think that any two cases having an issue in common are part of the same case or controversy for purposes of Article III of the Constitution? Because I believe that the same set of facts and the law that's involved here in terms of whether these windows were properly designed or properly manufactured is applicable to both, granted that there are differences between the fact that Prolite is relying upon a contract to make its claim, but the homeowners are simply relying on a different law. Do you have any case law you're relying on for the proposition that claims in which there is some either factual or legal overlap are, in fact, part of the same case or controversy? I don't, Your Honor, but I can certainly. You removed this case. Yes, sir. How could you remove it without researching that point? Well, we believe that because of the fact that Prolite was the seller of the windows and they sold the windows that were allegedly defective in manufacture to the same homeowners that are making the claim, that that indeed provided the basis of how much to remove. I asked a concrete question, how you could remove a case without researching a vital legal point. Just having, intuiting something, you have to know is not a way to figure out what the law is. All right. It's perfectly obvious that neither side is prepared to discuss this issue today. We will order supplemental jurisdictional briefs within 14 days, and the briefs have to address two questions. First, are consumer claims part of the same case or controversy as Prolite's claim? Second, if they are not, was the case removable at all? That is, could WM manufacturers remove a case that was partly within federal jurisdiction and partly not? There may be an implied third question there, which is if it was removable, what should we do now? Should the consumer claims be dismissed or should the whole case be remanded? Those briefs will be due in 14 days. And now, Mr. Fertil, let's go back to the merits. Thank you, Your Honor. You know, on the warranty claims, Plygym seems to be arguing that only manufacturing defects are covered. I saw that phrase only in one part of one warranty. I have to tell you, I was using a magnifying glass. But the eyes aren't what they were. But is there not a difference between manufacturing defects and defects in a product as manufactured? I don't think, for purposes of interpreting these warranties, Your Honor, that there is. Is there a difference between manufacturing defects and defects in material and workmanship? For purposes of the analysis in this case, I don't think there is. See, I'm just not convinced that the warranties are quite as limited as Plygym portrays. Well, I think, Your Honor, a reading of that warranty does indeed limit it because of the fact that, you know, the language talks about components that have to have a defect in it as manufactured and resulting in specific manifestations, at least as it relates to the components that are at issue here. And in particular, the 1500 Series warranty talks about it only applying to defects in manufacture that result in vinyl components that either chip, crack, peel, pit, blister, or corrode. And as a result of that, that, I believe, the language is clear and limits the applicability of this warranty. Are you saying the warranty does not include cracking and corrosion? No, it does, Your Honor, it does. But it doesn't, it isn't as broad as Prolite is attempting to claim. They're attempting to claim that it covers any type of manufacturing defect. And how is that to be determined? Who determines if it's a manufacturing defect? Well, I think that the language of the warranty does. And in terms of whether or not it's going to be honored, in terms of being covered by the warranty, is something that the manufacturer, Plygym, in this particular instance, would determine. But it's got to be within the specific language of the warranty, as we've indicated here, in the 1500 Series warranty, which isn't as broad as Prolite attempts to construe it. Did any of these homeowners submit warranty claims? No. But your people went out to the location and looked at the windows? Yes, indeed. There were occasions I wouldn't go so far as saying that the record supports that Plygym went to every homeowner that's involved in this case. But, indeed, they did go out and attempted to address and look at what these people were complaining about. But they never – there was nothing that would suggest that they did so because they felt that the warranty, under these particular circumstances, covered those windows. As the district court pointed out, the mere fact that a manufacturer may decide to go out and attempt to accommodate its customers and keep them happy and satisfied in some way is not a waiver of or a deviation, necessarily, from the terms of the warranty which may apply. But not all these customers had the same complaint, did they? Were there different, varying complaints? There were varying complaints, Your Honor, but generally speaking, the one that Prolite and the homeowners were hanging their hats on is this claim by Mr. Meshlam that there was excessive air infiltration. That seems to be the commonplace complaint, and that's what Prolite continues to argue, both at the district court level and in its appellate briefs, that that's the problem that these windows presented. You know, I was wondering why is an expert needed if there are visible gaps in windows? I mean, couldn't the homeowners have made out their claims themselves by testifying that they saw gaps, felt the air, couldn't keep their rooms temperate? I mean, the primary purpose of a window is to keep out cold air and your neighbors. Your Honor, I disagree. I think under these circumstances here, first of all, that argument was never presented by Prolite to the district court or to any court in this case that expert testimony wasn't needed. But secondly, I think under these circumstances, indeed it is, that it's just insufficient where you're dealing with a circumstance where the claim is that the window was not properly manufactured. In other words, that there were manufacturing defects. The mere fact that a window may have air infiltration doesn't make it defective. The mere fact that a consumer subjectively comes in and says, hey, I think my windows have more air coming in than my past windows have, doesn't establish a breach of warranty. You may be lucky about the plaintiff's choice of claim, but that's why I raised the question about the implied warranty of merchantability because that's exactly the sort of claim that would be, whatever this is, it doesn't work as a window. It works more as a knothole. But I gather, well, Mr. Stevens said there is no claim under the warranty of merchantability. No, Your Honor, there is no. And first of all, the warranty itself disclaimed it, the implied warranty of merchantability, but that's not even an issue here because, as the court has pointed out, that's never been a claim. I thought that kind of disclaimer was valid only as between merchants. Isn't that what the UCC says? Maybe I've forgotten. But in any event, Your Honor, your observation was correct at the beginning during Mr. Stevens' comments that that's not an issue in this case because it's never been pleaded in a case as a cause of action or a basis upon which to assert. Again, we're going back to the fact that, as I've heard Mr. Stevens indicate in response to questions this morning, that this is no longer a claim by Prolite that the service rebate obligation was breached. It's purely a claim that there is somehow a violation of the implied covenant of good faith and fair dealing. And I still don't understand, I guess, the basis upon which that claim is being made, other than the fact that in the briefs Prolite has asserted that there's somehow in this contract a service rebate obligation, an indication that there was some level of customer satisfaction, which was the purpose of that contract. But as pointed out by the district court here, I think very aptly, the arrangement here in that service rebate obligation was simply to set forth conditions under which Prolite could obtain a 3% rebate on its overall sales from Applied Gem in exchange for servicing the windows. And that particular obligation was in no way contingent upon or made a condition precedent for Prolite's sale of windows in the state of Wisconsin. And so therefore it becomes clear, at least from a legal perspective, that there was no bargain for term or fruit of the contract which would relate to customer satisfaction. And if that being the case, there simply isn't any basis upon which you can claim under these circumstances that there was a breach of this implied warranty of good faith and fair dealing. As the courts pointed out earlier, and Mr. Stevens has conceded, there is no evidence that Prolite ever approached Applied Gem and said, Applied Gem, we want you to replace all these windows because that's the only way we're going to be able to maintain customer satisfaction or maintain our business. That was never done. There's no indication that Applied Gem ever denied any such request. There's no indication that Applied Gem ever denied any involvement and or response to concerns that Prolite may have raised with regard to air infiltration issues. There was an obligation under the service rebate contract to provide replacement parts, and there's no indication that Applied Gem did not live up to that particular aspect of the warranty or that contract. And accordingly, there's just no evidence in this record, as the district court concluded, to suggest that there is a basis upon which to move forward on a claim for failure to provide good faith and fair dealing in the service rebate contract. But Mr. Stevens argues that your folks went out to these homeowners, helped try to fix these windows over and over and over again, and wouldn't your people just say, hey, maybe we need to put a new window in? Well, Your Honor, there's no doubt that Applied Gem indeed went out and looked at these windows, but there was never any determination that these windows needed to be replaced. There was never any request that they be replaced. Well, apart from the request, aren't you guys the experts on those? Well, Your Honor, that may be the case, but I think that doesn't directly come into play with regard to whether or not there is some type of a breach of the service rebate obligation. I mean, that was a discretionary call that the contract allowed my client, Applied Gem, to make. In other words, if they went out and decided that certain windows needed to be replaced in full, they would make that decision, and if they requested ProLite to do that, then they would have had an obligation to reimburse ProLite for the reinstallations that they had approved. But absent that, I don't think that whether or not my client decided on its own to replace these windows has any impact on the claims that are being asserted in ProLite in this case, whether it be for a breach of contract or whether it be for the breach of the implied good faith and fair dealing doctrine. So, again, I think that this whole case kind of circles around, at least from my perspective, back to what Mr. Michelin did or didn't do, the plaintiff's experts. In other words, ProLite's claims against my client, Applied Gem, as well as the consumer's claims, the homeowner's claims, are all premised upon Michelin's opinion that these windows contain some type of defect which allowed for excessive air infiltration. And if Michelin's opinions are excluded, as the district court had concluded, ProLite and the homeowners are unable to establish a prima facie case regardless of how they want this court to interpret either the service rebate obligation or the warranties. And in this particular case, as the court has already alluded to, Mr. Michelin's opinions here simply don't meet the admissibility standards under the federal rules. Now, the claim is being made that Mr. Michelin's experience somehow is, in and of itself, sufficient to allow the admissibility of his opinions. But the case law, I think, is pretty clear that experience has to be coupled with some type of a reliable methodology and applied to sufficient facts in the case in order for it to pass through admissibility thresholds. Could the flaws that you identified in the expert's report have been the subject of cross-examination? I mean, aren't these the types of things that go to the weight of the evidence as opposed to its admissibility? No, Your Honor, I don't think so. And here's the reason why. You know, Mr. Michelin did absolutely nothing to be able to position himself, whether it be from an engineering standpoint or an experience standpoint, to offer an opinion on the existence of a defect in this window. I mean, if we just look at what he didn't do, he didn't review any manufacturing or design standards as it relates to any of the windows in this case. He didn't even inspect any windows, exemplar windows, but for one, 1,500 series windows that was uninstalled. But when he looked at that window, he did not make any determination as to whether the window deviated from design standards, what the performance level of that window was, or how that particular exemplar window even compared to the windows he had examined in the various homeowners' homes. He then also recognized that there indeed are particular standards, performance standards, that these windows are sold under, and in this particular case there's an ENERGY STAR standard that was represented to be applicable to this window with accompanying test results. Mr. Michelin never looked at any of that test information that might be out in the public domain. He reviewed none of Plygem's test information, so he had no threshold to even make a determination as to what the performance level was of this particular window in an appropriately manufactured condition, even by his own definition. So without that, it's no longer a question of cross-examination, Your Honor. It's a question of the threshold admissibility, and the fact that he had no methodology and did not avail himself of any particular information, critical information, to be able to come to a conclusion that these windows had manufacturing defects is really what makes his entire opinions inadmissible, as the district court concluded. And I think that there's clearly no basis for Prolite to assert that the district court here abused its discretion under the glaring omissions in Mr. Michelin's analysis of this case. So basically, in summary here, is that if the court concludes and affirms the district court, as it relates to Michelin's opinions, that that permeates all of the claims, whether it be that of the homeowners or Prolite, because there's simply no basis upon which there can be a conclusion that there is a manufacturing defect in these windows. Thank you. Thank you, Mr. Fertel. Anything further, Mr. Stevens? Thank you. Frankly, I don't think that we needed an expert in this case, but you can never assume that to be the case, because anybody looking at these windows, and if they look at the pictures in Mr. Michelin's report, it's intuitively obvious what these defects are and what the problems are. Just using our common sense, we all have products in our house that we can tell when they're defective or not without having an expert look at them. These are obvious defects that can be seen by anybody, regardless of their level of education or knowledge. All you have to do is look at the pictures and have somebody point at the gaps and say, is this acceptable, is this normal? Well, how do you know the defect wasn't from the installation by the contractor? Well, Mr. Michelin said it didn't, because you can simply see the parts that are too long or too short. Well, you just said we didn't need an expert. Right, right. I agree, we don't need an expert, but I'm not going to file a case like this without an expert, because then I'm going to spend my whole time defending the fact that you can't prove your case without an expert. So, no, I didn't need an expert. Anybody with any kind of practical experience can look at these windows and see the gaps and see that the parts don't fit together right. This isn't rocket science here. That's why I brought my little example up here. The parts just don't fit together, and there's just big gaps, and then in the wintertime when it gets below 20 degrees, the cold air comes in, the windows frost up, the humidity in the house condenses, and water comes down the windows and rots out the sills. All these people have to replace all of the windows in their house. These are brand-new houses, brand-new windows, and from day one they haven't functioned, and they have to replace them all, simply because these windows, because they just came off the line, they were a new product, they hadn't been tested, there wasn't enough quality control, and they were defective. The parts just didn't fit together right. It's just that simple. I mean, if the parts on this desk didn't fit together right, and there were big gaps here, here, and here, and here, I wouldn't need an expert to say, oh, geez, was this a manufacturing issue or what the problem was? I can see the gaps. Let's say I could stick my finger up these cracks here. I mean, why do I need an expert to tell me that this podium is defective? The windows are the same way. And then when the consumers see their drapes blowing because the air is coming through and the bugs come in and they've got frost and condensation, I mean, we had an expert because that's just how things are done. But the problems in this case do not require expert testimony. And as Mr. Fertel said, if Mr. Meshlam's opinions are allowed to stand, this case goes forward. Then everything else becomes questions of fact. And that's the issue here. Could a reasonable jury determine that Plygem reached its warranty with the consumers? Could a reasonable jury find that Plygem failed to exercise good faith in honoring its agreement with ProLite to properly service these windows, give them the right parts, give them the right advice? And if that's a question of fact, then summary judgment should be denied. Any other questions? Thank you. Thank you, Mr. Stevens. Let me repeat what I said earlier. The court directs the parties to file, Mr. Stevens? Oh, I'm sorry. The court directs the parties to file supplemental jurisdictional statements on the two questions that I have identified. They are due within 14 days, and they must address first whether the consumer claims are part of the same case or controversy, and second, if not, whether this case was removable. We will look forward to receiving those briefs, and when they are, the case will be under advisement. Thank you very much.